BERNARD C. POMMIER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pommier v. Commissioner
Docket No. 21783-83.
United States Tax Court
T.C. Memo 1986-506; 1986 Tax Ct. Memo LEXIS 100; 52 T.C.M. (CCH) 766; T.C.M. (RIA) 86506; October 7, 1986. *100 Bernard C. Pommier, pro se. Mitchell I, Horowitz, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in and additions to petitioner's income tax as follows: IRC 1954,
Year
Deficiency
Sec. 6653(a)
1978
$3,605.77
$180.29
1979
9,427.97
471.40
1980
6,082.82
304.15
After concessions, the issue for decision is the includability in petitioner's income of the interest and capital gain components of a stream of installment payments made under "Articles of Agreement for Warranty Deed". FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and related exhibits are incorporated herein by this reference. Petitioner resided in South Carolina at the time the petition was filed and had resided in that state since 1978. From 1962 through at least 1972 petitioner, then and until about 1978 a resident of Illinois, operated a construction business in Kankakee, Illinois, as a sole proprietor. Installment payments (to the extent of interest and capital gain) made under "Articles of Agreement for Warranty Deed" (the Articles of Agreement *101 or the contract) with respect to six apartment buildings built by this construction business between 1967 and 1972 are the amounts at issue in this case. On May 1, 1962, petitioner created Illinois Land Trust No. 959 (the trust, or Trust 959, or Land Trust 959) by deeding three parcels of real estate to the trust, and naming himself the sole beneficiary and City National Bank of Kankakee, Kankakee, Illinois, as trustee. That land, the original corpus of the trust, was not the land on which the six apartment buildings involved herein were later built. However, during the period 1967-1972, the six apartment properties became part of Land Trust 959, as more fully set forth hereinafter. The parties have stipulated the nature of an Illinois land trust as follows: Under Illinois state law, the Land Trust holds legal title to the real property in the trust, and the named beneficiary, or beneficiaries, holds the beneficial interest in the form of personal property. Although the legal titleholder, the Trustee of the Land Trust can take no action with respect to the properties in the Trust without the express written direction of all the beneficiaries. Further, since the Land Trust itself *102 is not a taxable entity, the beneficiaries must report all income derived from trust properties, and are entitled to all offsetting deductions. The Land Trust has a fixed life of twenty (20) years, which may be renewed on the written application of all of the beneficiaries. In order to obtain financing for the acquisition of the land on which petitioner's sole proprietorship would construct the six apartment buildings (and presumably as well as for the construction costs), petitioner "directed the Trustee to execute several mortgages and notes with Marycrest Savings and Loan Association" (Marycrest S&L). Petitioner described them as "construction loans". The date and principal amount of each loan made by Marycrest S&L as well as the apartment building to which the loan related, are shown below: Apt.
Building
Loan No.
Date
Amount
1
22334
11/9/67
$ 66,000
2
22670
8/22/68
72,000
3
22975-01
8/22/69
80,000
4
23056-01
4/29/70
40,000
5 [1]
23468-01
11/5/71
22,000
6
23652-2
7/7/72
52,6000
$332,600
Each of these buildings, as constructed, became part of Trust No. 959. The buildings were held as rental units. *103 In 1970, petitioner became interested in entering a new business: the pre-cut or pre-fabricated home business. Because petitioner's existing credit line was insufficient to launch him in that business, he sought additional credit. The People's Bank of Marycrest (People's Bank or the Bank) agreed to lend petitioner money on the condition that the loan be guaranteed by the Small Business Administration (SBA). In order to obtain an SBA guaranteed loan petitioner was required to utilize a corporation to conduct the pre-cut home business. In December 1971, he therefore formed Aron Homes, Inc. (the corporation), to engage in the business of constructing pre-cut homes and apartment buildings. Petitioner was sole shareholder of Aaron Homes. On February 4, 1972, and on August 24, 1972, petitioner, as President of Aaron Homes, executed notes in the principal amounts of $250,000 and $100,000, respectively, payable to People's Bank at an annual interest rate of 7.5 percent. The resulting $350,000 line of credit was 90 percent guaranteed by the SBA. Petitioner and his then wife personally fully guaranteed each of the notes. [2]
*104 On August 24, 1972, petitioner, as president of Aaron Homes, Inc., executed a "Security Agreement" in favor of People's Bank, with attached Collateral Areements. [3] This Security Agreement did not cover the six apartment buildings owned by the land trust. As further collateral for the SBA guaranteed loans, petitioner, on August 24, 1972, in his personal capacity and not as President of Aaron Homes, Inc., executed an assignment to People's Bank of all his "rights, power, privileges, and beneficial interest" in Land Trust 959. In June of 1973, petitioner sought unsuccessfully *105 to draw further on his line of credit at the Bank reflected in the SBA guaranteed loan agreements. He was then informed that he "no longer had an SBA loan", [4] since it "was not renewed as it should have been in February of 1973". Apparently, the SBA guaranteed loan was for a period of only one year, and the Bank, which had not had any prior experience with SBA guaranteed loans, was not aware that the loan had to be renewed yearly. Also, presumably because of the Bank's unfamiliarity with SBA procedures, it did not then take the prompt action required to obtain a renewal. In any event, petitioner was unable to meet his obligations, and he later learned from the SBA that the Bank "had requested a payoff and had already received a partial payment from SBA". In spite of considerable difficulties in obtaining materials in view of his strapped financial condition, petitioner nevertheless undertook to complete the 40 homes and the two apartment buildings that Aaron Homes had under construction, to sell them and use the proceeds to pay off his debts. *106 In order to complete the projects begun by Aaron Homes, petitioner made use of his personal resources and those of his sole proprietorship. In this connection, as a source of working capital, he used the rental proceeds from the tax apartment buildings that he had built as a sole proprietor, title to which had been placed in Trust 959. The record does not make clear how he was able to have access to such rentals in view of the fact that Trust 959 had been assigned as collateral for the SBA guaranteed loans which apparently were then in default. Nevertheless, he in fact did make such use of those rentals, and, at least in part as a consequence, the first mortgage obligations on the six apartment properties to Marycrest S&L were delinquent in an amount between $70,000 and $75,000. Aaron Homes filed its final U.S. Corporation Income Tax Return for 1975. It was apparently dissolved during that year, or in any event ceased to function thereafter. Petitioner, in order to discharge his various obligations and under pressure from the SBA, agreed to enter "into a contract to sell the property [the six apartment buildings] on a land contract". The objective of petitioner's entering *107 into the contract was quite plainly to make the proceeds of the sale available to discharge his SBA obligation, and included particularly among such proceeds was the interest payable by the purchaser on the installments of the purchase price as they became due. In furtherance of that objective, petitioner in fact arranged for a sale of that property to certain persons named Funk. Obviously acting upon instructions from petitioner, the City National Bank of Kankakee as trustee of Trust No. 959 agreed by "Articles of Agreement" [the Articles of Agreement for Warranty Deed] dated May 1, 1974, to "convey and assure * * * in fee simple, clear of all incumbrances whatever, by a good and sufficient stamped Warranty Deed" the land and six apartment buildings to Harold Funk and Eulalia M. Funk, Stephen A. Funk and Kathleen Funk (the Funks or the purchasers). The trustee's agreement to convey was conditioned on the Funks' "first mak[ing] the payments and perform[ing] the covenants" described in the "Articles of Agreement". Among the obligations thus undertaken by the Funks they agreed to make the following payments: [T]he sum of Six Hundred Fifteen Thousand and no/100---Dollars, *108 in the manner following: the sum of Five Thousand and no/100--- Dollars, cash on or before the date of delivery hereof, receipt whereof is hereby acknowledged, and the balance of $610,000.00 as follows: $42,000.00 on June 1, 1974 (of which $25,000.00 shall be in the form of a 5 year promissory note), and the balance of $568,000.00 in the following manner: $4,800.00 on the 1st day of July, 1974 and $4,800.00 on the 1st day of each and every month thereafter, with a final payment of the entire balance on the 1st day of June, 1984. The Funks were to pay "interest at the rate of 8-1/2 per centum per annum" and "all general taxes and special assessments" imposed after 1973. The $25,000 "5 year promissory note" called for was secured by a second mortgage on land held by the Funks in Kankakee County, Illinois. If the Funks failed to perform according to the contract, the parties agreed that the "contract shall, at the option of the [Trust] * * *, be forfeited and determined" and the Funks would "forfeit all payments made by them". Payments under the Articles of Agreement were to be made "at the office of Marycrest Savings & Loan Assoc.", presumably in order to satisfy petitioner's *109 mortgage obligation to Marycrest. However, petitioner testified that the Funks "put enough money down to catch up the mortgage payments". [5]
Under the Articles of Agreement, the Funks were to be given possession "on or before June 1, 1974". Additionally, the trustee was required to "assign to * * * [the Funks] all Leases and Security Deposits on hand as of June 1, 1974". [6] However, the Funks were not to "allow any mechanic's liens to attach to said premises" or make "any improvements or repairs upon said premises *110 exceeding the sum of Two Thousand and no/100 ($2,000.00) Dollars, without the written consent of" the trustee. The agreement further provided that "[a]ll real estate taxes, rentals and utilities shall be pro-rated between the parties as of the date of possession". Also, the purchasers were required to "keep the premises insured for the benefit of all parties hereto in a sum of at least Six Hundred Thousand and no/100 ($600,000) Dollars". In addition to the $4,800 monthly payments, the Articles of Agreement required monthly payments by the Funks of "1/12 of the taxes and insurance" which would be "placed into an escrow account for the payment of said taxes and insurance". On September 5, 1975, the petitioner had the trustee assign its interest in the Articles of Agreement to People's Bank. Under the assignment, the trustee agreed to "sell, assign, and set over to People's Bank Marycrest, certain Articles of Agreement for Warranty Deed dated May 1, 1974 * * * together with all sums due and to become *111 due thereon, with interest". People's Bank "covenant[ed] to perform the obligations of the Seller in said contract". Since People's Bank had already been paid by the SBA, it was in this assignment really "just acting agent for the SBA", at least to the extent of the 90 percent of the loan guaranteed by the SBA. This assignment, although absolute on its face, would appear to have been made only as further collateral for petitioner's obligations in respect of the SBA guaranteed loans. That petitioner continued to have an interest in the property is made clear by the context of the assignment, which indicates that its obvious purpose was to be a means of repaying the SBA, and that on repayment the stream of income would revert to petitioner. Such repayment could not unreasonably have been contemplated from possible profits that might be realized in some subsequent business venture. This continued interest of petitioner is reflected in his reexecution on April 27, 1982, of Land Trust 959 for an additional period of 20 years, and his hereinafter described declaration of forfeiture against the Funks in 1985, notwithstanding that these actions were undoubtedly taken at the behest *112 of People's Bank or the SBA. Sometime between March 13 and March 15, 1985, the trustee presented, at petitioner's request, a "Thirty Day Notice of Intentions To Declare Forfeiture And Demand For Possession" to the Funks. The basis of the forfeiture was the Funks' failure "to pay a certain installment June 1, 1984". By the time of trial herein (February 25, 1986) the apartment buildings had been "sold at a sheriff's sale" and petitioner was still "personally responsible" for the $87,000 balance due the SBA in repayment of the loan to Aaron Homes in accordance with his personal guarantee of that loan. In each of the years at issue (1978-1980) payments under the Articles of Agreement were made in the amount of $57,600, and the parties have stipulated that the components of that amount for each year were as follows: 1978
1979
1980
Interest
$44,563
$43,422
$42,154
Ordinary Income [7]
961
1,026
1,307
Principal
12,076
13,152
14,139
$57,600
$57,600
$57,600
On both his 1976 and his 1977 income tax returns, petitioner reported as "Interest income" on his Forms 1040 amounts *113 which included the interest (described as "Contract Interest") reflected in the payments made by the Funks, and took deductions in respect of interest owed by him which were apparently paid out of the Funks' payments. In contrast, for the years at issue -- 1978, 1979, and 1980 -- petitioner did not report as interest received any amounts reflected in the Funks' payments, nor did he take any deductions for interest owed by him that were apparently discharged out of such payments. The Commissioner, in his notice of deficiency, increased petitioner's taxable income by the amount of the interest and "ordinary income" portions of the payments made in 1978, 1979, and 1980. In that notice, the Commissioner asserts that petitioner's "interest income * * * is not fully reported" on his returns and that "the taxable long-term capital gain [8] * * * from the installment sale of apartments * * * is not reported" on petitioner's returns. Petitioner has not disputed that the payments were not reported on his returns, but has based his disagreement with the Commissioner's adjustments on the fact that "[i]nterest and principal income from [the] apartment sale was assigned to S.B.A." It is *114 the Commissioner's position that "since the petitioner retained an interest in the Land Trust, and the land sales contract was assigned to retire his personal liability, the income received under the land sales contract was his income, which should have been reported on his returns for 1978, 1979, and 1980". The parties agree that if it is found that the petitioner should have reported these amounts, "then the petitioner is entitled to deduct the following interest expenses * * *": in 1978, $35,429.51, in 1979, $30,657.02, and in 1980, $28,708.58. This deductible interest expense is attributable to interest paid on the following: the six notes executed by the trustee at petitioner's direction in order to obtain the six construction loans from Marycrest S&L; a note executed by Aaron Homes (and presumably guaranteed by petitioner) to obtain from Marycrest S&L a $14,700 loan to build a house; and the two notes executed by petitioner as President of Aaron Homes to obtain *115 the SBA guaranteed loans from People's Bank. The amounts of interest paid on those categories of notes are as follows: 1978
1979
1980
Six notes to S&L re:
$18,456.49
$17,347.89
$16,151.60
apartment buildings
Note to S&L re: house
1,018.54
981.76
897.97
Two notes to People's
15,954.48
12,327.37
11,659.01
Bank re: SBA loan
$35,429.51
$30,657.02
$28,708.58
The net amount of income at issue for each year is as follows: Income from
Interest
Net income
installment sale
deductions
at issue
1978
$45,524
$35,429.51
$10,094.49
1979
44,448
30,657.02
13,790.98
1980
43,461
28,708.58
14,752.42
OPINION A proper analysis of this case has been made exceedingly difficult by reason of a fuzzy and confusing record. Although a number of details are set forth therein, the record cries out for clarifying explanations in various respects. We have tried to do the best we can with this record, and it is for that reason that some of our findings are of necessity preceded by such qualifying terms as "presumably" or "apparently". Bearing in mind that the burden of proof is upon petitioner, he must take the *116 consequences of any deficiencies in the evidence. The issue presented for decision is whether petitioner is properly taxable on the income portions (interest and capital gain) of installment payments made by purchasers under the Articles of Agreement with respect to the six apartment properties owned by him under an Illinois land trust. Petitioner's only argument to support his position that he should not be charged with those payments is that the "income from apartment sale was assigned to S.B.A. to pay off a $200,000 loss that I was personally responsible to repay". This is not a case where a debtor has transferred outright to his creditor property which, or the income from which, is used by the creditor to discharge the debtor's obligations. Plainly, in that situation the debtor would certainly not be chargeable with any income accruing thereafter with respect to that property in the hands of the creditor, the new owner. Here, petitioner was the owner of the six apartment properties held under an Illinois land trust. He made an installment sale of that property (under pressure from his creditor) in circumstances whereby he continued to be the sole beneficiary of the Illinois *117 land trust, but became entitled to receive the installment payments which included interest and capital gain components. It was the right to that stream of payments that he assigned to his creditor, and such payments were to be applied against his obligations. If for any reason he should come into funds, whether through the success of any business thereafter conducted by him or otherwise, and used such funds to pay off his obligations, the foregoing stream of payments would forthwith come back to him. Thus, what we have here is a taxpayer who is still the sole beneficiary of Land Trust 959, who has not parted permanently with his rights thereunder in respect of his contract of sale of the property (through the trustee), and who has a continuing interest in the installment payments made by the purchasers which are applied for his benefit in the discharge of his obligations to his creditor. Initially it is clear that petitioner is taxable on the income produced by the trust property. The parties have stipulated that "the Land Trust itself is not a taxable entity" and that "the beneficiaries [of such a Land Trust] must report all income derived from trust properties, and are entitled *118 to all offsetting deductions". The Commissioner treats petitioner's Article of Agreement with the Funks as an "installment sale of apartments". Petitioner does not challenge the Commissioner's characterization of the transaction as an installment sale, [9] and we do not consider such characterization to be at issue. Instead, it is petitioner's argument that the assignment of those payments relieves him of any tax in respect of such payments. The validity of that contention is central to disposition of the case. *119 The Funks' payments under the Articles were, by the terms of the contract between petitioner and the Funks, made so that the Funks could enjoy the benefits of possession of the apartment buildings and, ultimately on their fulfillment of their payment obligations, title to the six apartment buildings. The payments clearly had their source in the six apartment properties owned by petitioner through his trust and, before the assignment, were certainly taxable to him. By assigning to People's Bank his right to receive those payments, petitioner enjoyed the use of the payments, just as much as if he had collected them himself and then turned them over to People's Bank. Cf. ; ; . His "exercise of that power to procure the payment of income to another is the enjoyment, and hence the realization, of the income". . So much is especially clear when that power to procure payment is used to apply the money he is entitled to *120 collect to an obligation owed by him. ; ; ; ; . In particular, see P-H Memo par. 58,207, 58,894, 58,895, reversed as to other transactions on other grounds , which involved a factual situation very close to the present case. Consequently, apart from the component of the payments reflecting return of petitioner's basis, he is taxable on the payments as if he had collected them himself in the years they were made under the contract. [10]; . *121 This proposition is particularly clear with respect to the portion of the payments that represent gain. ; . . With respect to the interest portion of the payments, no argument is made that such portion should be treated any differently. In addition, no basis has been presented for a finding that the interest was paid as anything other than compensation for postponing the dates on which the income from the sale of the apartment buildings could be enjoyed. We find that petitioner had, at the time the assignment was made, a right to the interest that the Funks might pay under the contract and that his "giving away of this right to income in advance of payments" does "not * * * change the incidence of the tax". Cf. . As to the section 6653(a) addition to tax, we think that the underpayment of tax was not "due to negligence or intentional disregard of rules and regulations" within the provisions of that section. *122 Petitioner reported the income from the payments in 1976 and 1977 on the returns for those years which were prepared by his accountant in Illinois, who correctly analyzed the situation. Upon moving to Florida his returns were prepared by a national firm of return preparers who took a different view of the matter. Although in our judgment their view was incorrect, we do not fault petitioner for relying on their conclusion in a confusing and complex situation, at least to the point of finding him guilty of "negligence or intentional disregard of rules and regulations". Decision will be entered under Rule 155.
Footnotes
1. Paragraph 32 of the stipulation of facts refers to this loan as relating to apartment building "6", but that designation would appear to be a typographical error.↩
2. The documents reflecting the agreement between petitioner, People's Bank, the SBA, and Aaron Homes -- which documents might shed some light on the obligations undertaken by these parties -- have not been provided to the Court as a part of the record. The one exception is the Security Agreement described hereinafter.↩
3. There is no evidence in the record of any similar previous agreement at the time of the $250,000 note, February 4, 1972. Also, there is at least some ambiguity as to whether the August 24, 1972, agreement covers the $250,000 note in addition to the August 24, 1972, $100,000 note. On the first page of the agreement there is reference to "all loans * * * indebtedness * * * now existing or hereafter arising". On the other hand, the fifth page refers to "[s]uch amounts as may be from time to time requested by Borrower * * * but not exceeding in aggregate amount at any time outstanding * * * $100,000.00 * * *".↩
4. Although the parties from time to time have referred to an "SBA loan", the loan was in fact made by Peoples Bank and guaranteed by the SBA. However, to the extent that the SBA "paid off" People's Bank, it undoubtedly stepped into the shoes of the Bank and thus became a creditor of Aaron Homes as well as of petitioner who had guaranteed the obligation of Aaron Homes. For convenience, we will also use the same short hand expression referring to the matter as involving an "SBA loan".↩
5. The Funks, by the date of execution of the Articles of Agreement had paid $5,000 cash. On June 1, 1974, they were obligated to pay $17,000 more in cash and a $25,000 5-year promissory note which note was secured by a second mortgage on land held by the Funks. By the date of the hereinafter described assignment of the Articles of Agreement to People's Bank, the Funks would have made an additional 15 payments of $4,800 each, totalling $72,000. Presumably, these payments discharged petitioner's obligation to Marycrest S&L. However, the record is unsatisfactory in this respect, but indicates that interest was paid on the Marycrest mortgage loans through 1980.↩
6. It is unclear from the record why these leases were available for assignment to the Funks given the People's Bank and SBA interests in the income from the apartment buildings.↩
7. This item is based on the capital gain realized on the sale.↩
8. The portion of the payments under the Agreement which the Commissioner, in his notice of deficiency, describes as "long-term capital gain" are stipulated to be items of "ordinary income". See n. 7, supra.↩
9. Petitioner made some argument at trial that he objected to the Commissioner's characterization to the extent it placed him in the position of seller under the Articles of Agreement. He argued that he had "already assigned" his "rights, power, privileges, beneficial interest [in the six apartment buildings] to the bank". However, the 1972 assignment of his beneficial interest is stipulated to have been made "as collateral for the S.B.A. guaranteed loans". As a result, it is clear that this assignment does not rise to the level of a "substantial disposition" that would relieve him of the income tax liability that accompanies ownership of a beneficial interest in trust property. See ; ; ; .↩
10. No argument is made that at his assignment of the Articles of Agreement petitioner exchanged for consideration his right to receive payments under the Articles and that therefore petitioner realized a gain from such an exchange in 1975. Further, no evidence on the record would support such a characterization of the assignment.↩